**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 13-CV-21604-WILLIAMS**

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES,

      Plaintiff,

vs.                                           **SEALED**

FLORIDA NATIONAL UNIVERSITY, INC.,
d/b/a FLORIDA NATIONAL UNIVERSITY
ONLINE LEARNING CAMPUS,

      Defendant.

_____/

## ORDER

      THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment [D.E. 19] and Defendant's Cross-Motion for Summary Judgment [D.E. 25]. For the reasons stated below, Plaintiff's Motion for Summary Judgment [D.E. 19] is DENIED and Defendant's Motion for Summary Judgment [D.E. 25] is GRANTED.

### I.    Background

      Plaintiff Florida International University (hereafter "FIU") brings this action asserting six claims all stemming from the alleged trademark infringement of Defendant Florida National University ("FNU") in its use of a similar name [D.E. 1]. This is not the first such dispute between the parties, as will be discussed below.

      FIU is a 50-year old public university located in Miami, Florida, serving more than 50,000 students and offering more than 180 bachelor's, master's and doctoral degree programs [D.E. 19-2 ¶¶ 1-3]. FIU owns United States Trademark Registrations for several marks, including "Florida International University" and "FIU." *Id.* at ¶ 4. FNU is

a Hialeah, Florida-based for-profit higher education institution that began operating under the name Florida International Institute in 1987 [D.E. 42 ¶ 27].[1]  FNU's student body consists of 2,795 students, and the school offers associate, bachelor's and master's degrees, along with an English as a Second Language ("ESL") curriculum [D.E. 25-1 ¶¶ 24-32].

In December 1987, Defendant changed its name from "Florida International Institute" to "Florida International College" [D.E. 42 ¶ 29].  This name change triggered the first litigation between the parties.  In 1989, FIU brought a trademark infringement action against Defendant for its use of the name Florida International College [D.E. 25-3].  The parties later entered into a settlement agreement, under which Defendant agreed to take the name Florida National College [D.E. 25-4].  The parties coexisted in this way until 2012, when Defendant changed its name to Florida National University after receiving accreditation to offer a master's degree [D.E. 25-1 ¶ 11].

On May 3, 2013, FIU filed this Complaint alleging that Defendant has infringed upon FIU's marks by adopting confusingly similar terms in "Florida National University" and "FNU" [D.E. 1].  The Complaint asserts six causes of action: (1) federal trademark infringement, (2) federal unfair competition, (3) Florida trademark dilution, (4) Florida trademark infringement, (5) common law trademark infringement and unfair competition, and (6) cancellation of State of Florida trademark registration.  *Id.*  The parties have submitted cross-motions for summary judgment [D.E. 19 and D.E. 25], each of which is supported by depositions, documents and other evidence placed in the record.  The

---

[1] The Court notes that Florida National University's logo indicates that the school has been operating since 1982, not 1987 [*see, e.g.,* D.E. 27 at 4].  Though the record is not entirely clear, it appears that the school was originally founded under the name Compu-Tech, before changing its name to Florida International Institute in 1987 [*see* D.E. 25-3 ¶ 15].

parties have agreed that the Court has before it all of the evidence needed to rule on these motions, and that the Court need not take live testimony before ruling on the motions.  The Court heard oral arguments on these motions on December 3, 2014.

## II.     Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).  The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted).  At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to

3

[his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

For issues for which the movant would bear the burden of proof at trial, the party seeking summary judgment "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence…that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (emphasis in original).

However, in a nonjury case such as this, in which the Court is the trier of fact and there are "no issues of witness credibility," the Court may make factual determinations and draw inferences at the summary judgment stage based on the affidavits, depositions and other evidence in the record, because "[a] trial on the merits would

reveal no additional data" nor "aid the determination." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978).[2]

### III.    Count I: Federal Trademark Infringement

In Count I of its Complaint, FIU alleges that Defendant's use of the terms "Florida National University" and "FNU" has infringed on FIU's federally registered marks, in violation of 15 U.S.C. § 1114 of the Lanham Act [D.E. 1 ¶¶ 36-41].   Under the Lanham Act, a defendant is liable for infringement if, without consent, he uses "in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark" which is "likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a). To prevail on a federal trademark infringement claim, a plaintiff must demonstrate (1) that its mark has priority, and (2) that the defendant's mark is likely to cause consumer confusion. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  It is undisputed that FIU's marks have priority [*see* D.E. 25 at 7].  The issue is whether Defendant's marks are likely to cause consumer confusion.

Courts in the Eleventh Circuit consider seven factors when determining whether or not a likelihood of consumer confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' trade channels and customers; (5) similarity of advertising media; (6) the defendant's intent; and (7) actual confusion. *Frehling*, 192 F.3d at 1335.  Of these factors, the type of mark and evidence of actual confusion are considered the most important. *Id.* (citing *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989)).  However, likelihood of confusion should not be determined "by merely analyzing whether a majority of the

---

[2] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

subsidiary factors indicates that such a likelihood exists…[r]ather, a court must evaluate

the weight to be accorded the individual factors and then make its ultimate decision."

*Suntree Tech., Inc. v. EcoSense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012)

(quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986), *cert. denied,* 481

U.S. 1041 (1987)); *see also Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d

641, 649 (11th Cir. 2007) ("Because the bottom line is the likelihood of confusion,

application of the *Frehling* factors entails more than the mechanistic summation of the

number of factors on each side; it involves an evaluation of the 'overall balance.'")

    In its motion for summary judgment, FIU argues that it has produced evidence as

to each of these factors, and that there are no genuine issues of material fact as to the

likelihood of confusion created by FNU's marks [D.E. 19-1 at 5].  FNU argues that FIU

has failed to meet its burden on all of these factors, and therefore the court should grant

summary judgment in its favor [D.E. 25 at 7-19].

### 1.  Type of mark

    Classifying the type of mark requires a determination of whether Plaintiff's mark

is strong or weak. *Frehling*, 192 F.3d at 1335.  The stronger the mark, the greater the

scope of protection afforded to it. *Id.*  A mark may fall into one of four categories of

distinctiveness, in increasing levels of protection: (1) generic, (2) descriptive, (3)

suggestive, and (4) arbitrary. *Id.*  These categories are based on the relationship

between the name and the service or good it describes. *Id.*  Generic marks refer to a

particular genus or class of goods or service providers that includes the plaintiff; these

marks are not entitled to protection. *Id.* (citing *Freedom Sav. & Loan Ass'n v. Way*, 757

F.2d 1176, 1182 n.5 (11th Cir. 1985)).  Descriptive marks describe a characteristic or

quality of an article or service. *Id.* Suggestive marks "subtly connote something about the service so that a customer could use his or her imagination and determine the nature of the service." *Freedom Savings*, 757 F.2d at 1182 n.5. An arbitrary mark is a "word or phrase that bears no relationship to the product." *Frehling*, 192 F.3d at 1335. Arbitrary marks are the strongest of the four categories. *Id.* at 1335-36.

The strength of a mark may also be affected by the degree to which third parties make use of the mark; the less that third parties use the mark, the stronger it is, and the more protection it deserves. *Id.* at 1336. A mark's strength may also be enhanced if the mark is "incontestable" – that is, if it has been registered for five years with the Patent & Trademark Office, and its holder has filed an affidavit as required by 15 U.S.C. § 1065(3). *Id.* An "incontestable" mark may not be challenged on the grounds that it is merely descriptive and without secondary meaning. *Dieter*, 880 F.2d at 328. Both parties agree that the Florida International University mark has incontestable status [D.E. 42 at 4].

FIU asserts that the Florida International University mark is "presumptively strong," based on its status as an incontestable mark [D.E. 19-1 at 6]. FNU argues that the strength of the mark is diluted because the mark employs geographic and generic terms, and because the field is crowded with other universities using similar names [D.E. 25 at 7-10]. In FNU's view, the Florida International University mark is no more than a "highly descriptive" mark and therefore weak. *Id.* at 7. FIU argues that the words comprising its mark should not be parsed and assessed individually to determine the distinctiveness of the mark, and that other state universities should not be considered third-party users because of their "affiliation" with FIU [D.E. 32 at 5-7].

The Court agrees that the terms comprising the Florida International University mark are either generic or descriptive when viewed in isolation; however, because this mark is "incontestable," the Court finds that the mark is descriptive with secondary meaning. *See Dieter*, 880 F.2d at 329. While an incontestable mark is generally considered a "relatively strong mark," *see Frehling*, 192 F.3d at 1336, this presumption may be rebutted by evidence of extensive third-party use of the mark. *See Southern Grouts & Mortars, Inc. v. 3M Co.*, No. 07-61388-CIV, 2008 WL 4346798, at *16-17 (S.D. Fla. Sept. 17, 2008); *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F.Supp.2d 1261, 1265-66 (S.D. Fla. 1999); *Michael Caruso and Co., Inc. v. Estefan Enters., Inc.*, 994 F.Supp. 1454, 1459-60 (S.D. Fla. 1998); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979). FNU argues that the Florida International University mark is weakened by the abundance of other universities with names using the same words and structure, including: Florida A&M University, Florida Atlantic University, Florida Christian University, Florida Gulf Coast University, Florida Memorial University, Florida Polytechnic University, and Florida State University [D.E. 25 at 7-8]. FIU contends that, because most of these schools are part of the state university system along with FIU, they should not be considered "third party users," and that the number of third-party users cited by FNU is too small to diminish the strength of its mark [D.E. 32 at 7].

The Court finds little merit in FIU's arguments. FIU makes the conclusory assertion that the "affiliation among these [state] institutions assures that, despite any name similarity, there is no confusion as to the source of the members' educational services" without citing any record evidence or legal authority to support this conclusion.

8

The Court fails to see how a consumer would know based on their names alone that, for example, Florida International University and Florida Atlantic University are part of the state university system and that Florida National University and Florida Memorial University are not.

FIU also argues that a third-party user must be "unrelated" to the holder of the mark in this analysis, and therefore the other state universities should not be considered third party users. But, once again, the legal support for this argument is lacking. FIU relies primarily on *National Football League Props., Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651 (W.D. Wash. 1982), a case that dealt with the manufacture of knock-off NFL team jerseys. Nothing in *NFL Properties* suggests that a third-party user must be unrelated to the holder of the mark in order to diminish the strength of the mark.[3] And while FIU asks the Court to consider all the state universities as affiliates or a single, collective organization for purposes of this analysis, it is worth noting that FIU identified some of these state schools as competitors to its marketing company [*see* D.E. 25-24 at 4-5]. After considering the arguments and the evidence, the Court finds that the other state schools using the words "Florida" and "University" shall be considered third-party users when analyzing the degree to which third-party users have diluted the strength of the FIU mark.

---

[3] In oral arguments, FIU seemed to suggest that any NFL team may sue to protect the trademark of any other team, and that, by analogy, in this case the other state schools using "Florida" and "University" should be regarded in a similar vein. Therefore, according to FIU, these schools should not be considered third-party users diminishing the strength of FIU's marks. This argument takes quite a leap from the facts of *NFL Properties*. According to *NFL Properties*, each NFL team owns its trademarks, which are then licensed by the teams to an NFL subsidiary, National Football League Properties, Inc., which in turn contracts with manufacturers to make NFL-licensed products using the team marks. *National Football League Properties*, 532 F.Supp. at 655. Nothing in *NFL Properties* indicates that, say, the Seattle Seahawks could sue to protect the mark of the New England Patriots simply because both are members of the NFL. And in the unlikely event that the Patriots were to rebrand themselves as the "New England Seahawks," surely this would be treated as third-party use diminishing the Seattle Seahawks mark, irrespective of the fact that both teams are members of the NFL.

Next, FIU argues that FNU must show a "substantially higher" number of third-party users to give substantial weight to this factor [D.E. 32 at 7].  Again, FIU has cited no authority for this proposition.  There is "no hard-and-fast rule about the number of other users which diminish a mark's strength."  *Stuart J. Kaufman, M.D. & Assocs., P.A. v. Bausch & Lomb Inc.*, No. 8:13-CV-461-T-33EAJ, 2013 WL 6154166, at *5 (M.D. Fla. Jul. 25, 2013).  Courts have found that a mark has been weakened by third-party use based on a relatively small number of third-party users.  *See, e.g., AmBrit*, 812 F.2d at 1539 (affording lesser protection where eight third-party users in the same market employed similar trade dress); *Homes & Land Affiliates, LLC v. Homes & Loans Magazine, LLC*, 598 F.Supp.2d 1248, 1261 (M.D. Fla. 2009) (finding "widespread third-party use" based on 18 instances of third-party use); *El Chico, Inc. v. El Chico Café*, 214 F.2d 721, 725 (5th Cir. 1954) (finding 27 instances of third-party use "for various products and articles" sufficient to classify a mark as weak).  Third-party use is also considered more potent when the users are operating in the same field as the plaintiff. *See Bausch & Lomb*, 2013 WL 6154166 at *5 (citing *Home & Land Affiliates*, 598 F.Supp.2d at 1261) (finding that the abundance of third-party users in the same field "underscores the relative weakness of the mark").  Here, FNU has identified 13 other entities using the terms "Florida" and "University" – all of which are aimed at the same education marketplace as FIU [D.E. 25 at 8].[4]  Given the prevalence of third-party use of the terms "Florida" and "University" in the specialized marketplace of Florida higher education, the Court finds the "Florida International University" mark to be relatively

---

[4] An educational institution doing business as Florida International College also operates in Florida [D.E. 42 ¶ 94].

weak.  The Court also finds the "FIU" mark to be relatively weak for the same reasons.  For these reasons, the Court finds that this factor does not favor FIU's position.

### 2. Similarity of the Marks

Next, the Court must determine the degree to which the two marks are similar.  In making this determination, the Court must consider "the overall impressions that the marks create, including the sound, appearance and manner in which they are used."  *Frehling*, 192 F.3d at 1337.  Both sets of marks at issue – Florida International University and Florida National University, and FIU and FNU – are obviously similar in sound and appearance.  Only one letter separates "FIU" and "FNU" and the names of the two schools are distinguished by only two syllables.  The analysis turns, however, on the meaning of the words used in the respective marks.  FIU argues that the words "national" and "international" are similar in meaning because both are geographic in character; in FIU's view, "the word 'national'…denotes a subset of 'international'" [D.E. 19-1 at 4].  But FNU argues that "national" and "international" have nearly opposite meanings, and therefore the two marks should not be deemed similar [D.E. 25 at 12].

"National" is defined by Merriam-Webster as "of or relating to an entire nation or country," or "owned and controlled or operated by a national government."  In contrast, "international" is defined as something "involving two or more countries: occurring between countries."  While it is true that multiple nations are required to make something "international" in character, it is a reach to suggest that an object defined as "international" necessarily includes those objects describes as "national."  In common usage, "national" and "international" are used to describe the domestic or overseas character of the matter being discussed.  Contrary to FIU's arguments, these terms are

not so closely aligned as to create a likelihood of confusion among consumers. And while "FIU" and "FNU" obviously share two letters, FNU's mark is not any more or less similar to FIU's mark than FAU, FSU or other universities in this crowded field. Given that most state universities self-identify by using such initialisms, it seems unlikely that the "FNU" mark increases the likelihood that a reasonable consumer would be confused as to the source of the services that it represents. *See Frehling*, 192 F.3d at 1337. The Court finds that, while the names of the two schools do sound similar, examined in totality this factor does not weigh in favor of a finding of a likelihood of confusion.

### 3. Similarity of the products the marks represent

Next the Court must examine whether the parties' services "are the kind that the public attributes to a single source." *Id.* at 1338 (citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)). The proper test does not turn on whether the services can be distinguished by consumers, but on whether the services "are so related in the minds of consumers that they get the sense that a single producer is likely to" offer both services. *Id.* While the Court should consider the "compositional differences" between the services, the inquiry should focus "on the reasonable belief of the average consumer as to what the likely source of the goods [or services] was." *Id.*

FIU argues that consumers are likely to be misled because "both parties are degree-granting institutions of higher learning with a significant overlap in curriculum" [D.E. 19-1 at 9]. Specifically, FIU emphasizes that both schools offer bachelor's degrees in accounting, business administration, criminal justice, health services administration and nursing, and master's degrees in business administration and health

services administration [*see* D.E. 19-2 ¶¶ 32-37].  Both schools also offer non-degree

instruction in English as a Second Language, though the respective ESL programs

appear to have different missions [D.E. 19-2 ¶ 33; D.E. 25-1 ¶ 28].[5]  And both schools

offer online degree programs and dual-enrollment programs for high school students

[D.E. 42 ¶¶ 8-9, 56-57].

    In its cross-motion, FNU emphasizes the schools' seemingly different missions:

while FIU describes itself as a "top-tier research institution," FNU aims to "prepare its

students for immediate gainful employment upon graduation" [D.E. 25 at 13].  In support

of this argument, FNU highlights the differences in the student populations.  For

example, almost half of FNU's students are seeking associate's degrees – a degree that

FIU does not offer – and another 21 percent of FNU's students attend only ESL courses

[*see* D.E. 26-4].  It is clear to the Court that a significant portion of FNU's student

population is receiving a wholly different kind of education than that offered by FIU.

However, it is also clear that FNU offers several degree programs that overlap with

those offered by FIU.  As discussed above, the question for the Court is whether the

services "are so related in the minds of consumers that they get the sense that a single

producer is likely to" offer both services.  *See Frehling*, 192 F.3d at 1338.  For example,

in *E. Remy Martin & Co.*, the Eleventh Circuit found that a reasonable consumer could

conclude that a manufacturer of brandy and cognac was also a manufacturer of wine,

based on the similarity of the alcoholic goods.  *E. Remy Martin & Co.*, 756 F.2d at 1530.

Similarly, the Court finds that, despite the obvious differences in the educational models

---

[5] FNU offers what it describes as a "developmental program for English as a Second Language," which is apparently aimed at students who are not otherwise enrolled at the school.  FIU, on the other hand, offers an English as a Second Language Program as an "academic preparation course" aimed at international students already attending the university [*see* D.E. 19-5 at 2].

offered by the two parties, a reasonable consumer could conclude that the services provided by FIU and FNU are attributable to a single source. Therefore, this factor favors FIU's position.

### 4. Similarity of the Parties' Trade Channels and Customers

"Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods [or services] lessen the possibility of confusion, mistake or deception." *Frehling*, 192 F.3d at 1339 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980), *cert. denied*, 449 U.S. 899 (1980)). This factor takes into consideration where, how and to whom the services are sold. *Id.* The Court also must consider the level of sophistication and investment required of the parties' customers, which can influence the likelihood of confusion based on a mark. *See Freedom Savings*, 757 F.2d at 1185. While "the parties' outlets and customer bases need not be identical, some degree of overlap should be present" to weigh in favor of a likelihood of confusion. *Frehling*, 192 F.3d at 1339.

FIU's retail outlets include a website, two main campuses in Miami-Dade County and facilities elsewhere in South Florida [D.E. 42 ¶¶ 10-11]. Students traditionally apply to the school through its website without a formal interview. *Id.* at ¶ 25. In addition to traditional on-campus classes, FIU also offers online courses in both undergraduate and graduate level programs. *Id.* at ¶ 17. FNU also operates two campuses in Miami-Dade County — one of which is about two miles from FIU's main campus — and a website, and it offers online courses to its students. *Id.* at ¶¶ 57-63. FIU argues that the similarities in the parties' outlets weigh in favor of finding a likelihood of confusion [D.E. 19-1 at 10-11]. FIU also notes that it "offers nearly every advanced degree…that FNU

14

offers and both schools provide ESL [English as a Second Language] and dual-enrollment opportunities" [D.E. 32 at 11].  In response, FNU emphasizes the differences in the schools — noting, for example, that FNU does not provide on-campus housing — and argues that the two schools appeal to different customer bases: while FIU primarily serves "traditional" college-bound students, FNU focuses largely on "non-traditional" students, most of whom have been out of high school for 10 years or more before enrolling [D.E. 25 at 14-15].

Clearly, the differences between the schools' respective student populations are significant.  As discussed above, about 70 percent of FNU's students are seeking either associate's degrees or attending ESL programs that are not offered by FIU [see D.E. 26-4].  In other words, FNU's predominant customers are in the market for educational services that FIU simply doesn't provide.  Moreover, while FIU "recruits first time college students directly out of high school and targets students who are seeking four-year degrees" [D.E. 42 ¶ 14], most of FNU's students have been out of high school for an average of 10 years [D.E. 25-1 ¶ 57].  And unlike FIU, FNU does not require students to submit SAT or ACT test scores prior to admission.  *Id.* at ¶ 58.  Because it is clear that the vast majority of customers of FNU's services are highly dissimilar from FIU's customer base, the possibility of mistake or confusion is lessened in this case.  *See Frehling*, 192 F.3d at 1339; *Amstar*, 615 F.2d at 262 (finding the likelihood of confusion dampened where there are "substantial dissimilarities between the predominant purchasers of plaintiff's and defendant's products").  The likelihood of confusion seems even more remote considering the level of sophistication and the amount of investigation one would expect from prospective students when considering a particular

15

school or a particular kind of degree. *See Freedom Savings*, 757 F.2d at 1185 (finding

that customers "making a major investment" were more likely to be "well-informed

buyers" and therefore less likely to be confused by similar marks); *Welding Servs., Inc.*

*v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007) ("[S]ophisticated consumers…are less

likely to be confused than casual consumers of small items").

However, because both schools offer identical bachelor's and master's degrees,

the Court finds that there is some potential overlap in prospective students. And, by

offering online courses, the two schools appear to have similar outlets for some of their

services. Thus, it appears that FIU has met its burden to show "some degree of

overlap" in the two schools' retail outlets and predominant customers. *See Frehling*,

192 F.3d at 1339. But the Court gives this factor little weight in its overall analysis,

given the significant differences in the kinds of students targeted by these schools. The

Court finds that this factor does not weigh significantly in favor of a finding of a likelihood

of confusion.

### 5. Similarity of the Parties' Advertising Media

FIU markets to potential students through self-published magazines and other

marketing material; internet marketing, including FIU's website and search-engine

advertisements; internet search-engine optimization methods; advertising on English-

and Spanish-language radio stations, including WLRN, the regional public radio station;

licensing agreements with third-parties; athletic programs; and on-campus activities

open to the public [D.E. 42 ¶ 21]. FNU also maintains a website and advertises on the

internet, as well as in print media and with several local television stations and WLRN.

*Id.* at ¶¶ 63-68. FIU argues that there is sufficient evidence of overlap in the two

16

schools' advertising methods to weigh in favor of a likelihood of confusion [D.E. 19-1 at 11]. FNU concedes that it uses some advertising methods similar to FIU's, but argues that its method of procuring students relies less on advertising than on personal referrals and face-to-face interviews with students, which "virtually eliminates" the likelihood of confusion [D.E. 25 at 15]. In contrast, nearly all prospective FIU students apply for admission online without interviewing on campus [D.E. 42 ¶ 25]. FNU further argues that the likelihood of confusion is minimal because Internet searches using the term "Florida National University" are unlikely to generate information about FIU [D.E. 25 at 15-16].[6]

In examining the similarity of the parties' advertising, the relevant inquiry is whether there is likely to be a significant overlap in the audience of the media in which the parties advertise, such that a possibility of confusion could result. *See Frehling*, 192 F.3d at 1340 (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982)). Reviewing the record, the Court finds little evidence of an overlap in the *audience* of the schools' advertising.

Regarding the parties' online channels of advertising, it does not appear that their websites would create a likelihood of confusion; in fact, the respective websites are more likely to lead consumers to believe the two schools are distinct enterprises. *See Tana v. Dantanna's*, 611 F.3d 767, 778 (11th Cir. 2010) (finding that the parties' websites "would dispel rather than cause confusion...because the websites are

---

[6] FNU bases this argument on the report of its expert, Dr. Robert Frank, who conducted Internet searches to determine the frequency of overlap on the web when users search using the FIU and FNU terms [D.E. 25 at 15-16]. FIU filed a motion *in limine* to exclude Frank's report, on the grounds that Franks was not offering expert testimony because the search results of such "rudimentary Internet searches" are within the understanding of the average lay person [D.E. 51 at 13-14]. However, the Court finds that it need not consider Dr. Frank's report in deciding on these motions, for the reasons discussed above.

separate and distinct, suggesting two completely unrelated business entities"). And there is not enough evidence in the record for the Court to draw any conclusions about the potential overlap in the schools' online advertising audiences based on their use of banner advertisements, search-engine ads and social media.

FIU argues that "[b]oth parties also extensively advertise through printed publications including magazines, brochures, view books and flyers," but there is little evidence that these advertising channels are likely to reach the same *audience*. For example, Terry Witherell, FIU's vice president of external relations, emphasized in his deposition FIU's self-published magazine, which reaches roughly 120,000 readers "all over the world" [D.E. 19-4 at 9-10]. But there is nothing in the record indicating that any of these readers scattered around the world are likely to also read magazines or other local media in which FNU advertises. *See Frehling*, 192 F.3d at 1339-40 ("the standard is whether there is likely to be a significant enough overlap in *the readership* of the publications in which the parties advertise that a possibility of confusion could result") (emphasis added).

There is one aspect of their advertising where the Court does find an overlap in audience: Both FIU and FNU have advertised on the same local radio station, WLRN. The Court finds that this is sufficient to create a likelihood that the same consumers would be exposed to both marks. But once again the Court does not believe that this factor merits significant weight in its analysis, for the reasons discussed above.

### 6. Defendant's Intent

In determining whether consumer confusion is likely, the Court must also examine the defendant's intent, to determine whether the defendant "had a conscious

intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent." *Custom Manufacturing*, 508 F.3d at 648 (internal citations and quotations omitted).  FIU asserts that the "undisputed evidence demonstrates that FNU has consciously intended to capitalize on FIU's long-standing local and national reputation" [D.E. 19-1 at 12].  In support of this argument, FIU cites the following: (1) that FNU has been aware of FIU since its inception under the name "Florida International Institute"; (2) that FIU previously pursued a suit against FNU to force the school to change its name from "Florida International College" to "Florida National College"; (3) that, by calling itself a "university," FNU now employs a mark that resembles in style not only FIU but other state universities, which, FIU asserts, shows that FNU seeks to capitalize on the reputation of FIU and other state universities.  *Id.* at 12-13.  In addition, FIU alleges that FNU has sought to create the impression that it is related to FIU by promoting its participation in FIU events and asserting that it maintains a "transfer and articulation agreement" with FIU's School of Hospitality.  *Id.* at 13.

FNU asserts that it changed its name from "Florida National College" to "Florida National University" in a good faith effort to reflect the fact that the school now offers graduate level courses [D.E. 25 at 16].[7]  FNU further argues that FIU's consent to its use of the name "Florida National College" for more than 20 years is evidence that the change from "college" to "university" is not motivated by ill intent.  *Id.*  Finally, FNU asserts that it did in fact have a "transfer and articulation agreement" with FIU from 2007

---

[7] In its cross-motion for summary judgment, FNU also asserts that it changed its name because "in various foreign countries the word 'college' is viewed with disfavor as compared to 'university'" [D.E. 25 at 16-17]. This argument is based on a declaration from FNU's President and CEO, Maria C. Reguiero [D.E. 25-1 ¶¶ 69-70; D.E. 25-2 ¶¶ 41-42]. FIU asks that the Court disregard this declaration on the grounds that it contradicts previous explanations for the name change, and the statements contained in the declaration were not adduced during discovery [D.E. 32 at 13-14; D.E. 43 at 4-5]. If the Court were to exclude or consider this evidence, this would not change the Court's analysis of this factor.

to 2010, which FNU "inadvertently" failed to omit from its course catalogue after the agreement expired [D.E. 27 at 7; D.E. 42 at 14].[8]

"[P]rior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Michael Caruso*, 994 F.Supp. at 1462 (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)). Thus, the fact that FNU had prior knowledge of FIU's mark does not by itself create an inference of improper intent.[9] Nor does the Court find the prior litigation between the parties persuasive as evidence of improper intent, given that the parties coexisted pursuant to the terms of their settlement of that action for more than 20 years. And the Court does not find that a single reference to an articulation agreement with FIU, tucked in a list along with 18 other colleges and universities, is compelling evidence of an intentional plan to capitalize on FIU's reputation. For these reasons, the Court cannot adopt FIU's conclusory assertion that the undisputed evidence demonstrates defendant's improper intent to capitalize on FIU's name and reputation. Therefore, this factor does not favor a finding of a likelihood of confusion.

---

[8] FNU asserts that it has since removed any reference to the "transfer and articulation agreement" from its online catalogue [D.E. 27 at 7].

[9] FIU argues that the Court should disregard FNU's "good faith" argument because "good faith is not a defense to trademark infringement" [D.E. 32 at 14 (citing *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985)]. In *Fuji Photo*, the Fifth Circuit reversed a trial court decision that "cast aside" the seven-factor "likelihood of confusion" test and independently determined that any infringement by the defendant was done in good faith. *See Fuji Photo*, 754 F.2d at 595. The Fifth Circuit then discussed the seven-factor test and applied the trial court's good-faith finding to its analysis of the defendant's intent, finding that "assuming *arguendo* that the trial court was correct in finding Shinohara to have innocent intent, this factor drops out as immaterial." *Id.* at 598. Thus it is clear that, contrary to FIU's assertion, this case does not stand for the proposition that a defendant's good faith is immaterial to an inquiry into whether it acted in bad faith.

### 7.  Actual Confusion

As previously discussed, evidence of actual confusion – though not necessary to a finding of a likelihood of confusion – is the best evidence of the likelihood of confusion, and "the quantum of evidence needed to show actual confusion is relatively small." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010) (internal quotation omitted); *see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir. 1983).  While as few as two instances may suffice as evidence of actual confusion, of perhaps greater importance in this analysis is a consideration of who it is that is confused by the two marks: "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight…while confusion of actual customers of a business is worthy of substantial weight." *Safeway Stores*, 675 F.2d at 1167.

FIU has produced evidence of two instances of purported actual consumer confusion [D.E. 19-1 at 14].  The first example comes in the form of an email dated July 7, 2014, to an FIU administrator from Angela Puig, who is apparently an employee of Federal Express [D.E. 19-6 at 90].  In the email, Puig asks: "I would like to know if Florida National University is accredited with FIU?  Can you please provide me with an answer?"  *Id.*  FIU has provided no other information to give context to Puig's message, and nothing from the content of the email itself indicates that Puig is an actual consumer of higher education services.  Given the lack of certainty regarding Puig's motives for inquiring about the relationship between the two schools, the Court finds that FIU has failed to demonstrate that Puig qualifies as an "actual customer" for purposes of this analysis, and her email is afforded little weight.  *See Welding Services*, 509 F.3d at

1361 (affirming trial court's finding that evidence of actual confusion had little probative value "because of the uncertainty about what might have prompted the [purported customers'] inquiries").

FIU also points to a May 28, 2014, letter sent to FNU from Denise Gumboc, a California high school student who requested "any information that you could send me with regards to both admission to and programs at Florida International University" [D.E. 19-6 at 86]. According to the letter, Gumboc sought this information because she was "investigating the various colleges and universities [that] I am considering attending" as part of a sophomore class project. *Id.* The Court finds that this evidence does qualify as an instance of actual consumer confusion which merits greater weight than the email from Puig. However, a sole, *de minimis* instance of consumer confusion is not enough to militate in favor of a finding a likelihood of confusion. *See Tana*, 611 F.3d at 779-80; *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 802 F.Supp.2d 1273, 1285 (M.D. Fla. 2011), *aff'd*, 693 F.3d at 1347.

FIU has cited other evidence of confusion, including confusion among FIU employees over what, if any, affiliation FNU has with FIU, and one incident in which a radio announcer flubbed an advertisement for Florida National University by inadvertently calling it "Florida International" [D.E. 19-1 at 15]. But these are either the type of "short-lived confusion" that carries little weight, or simply too vague to credit in this analysis.[10] After examining the evidence of actual confusion cited by FIU, the court

---

[10] The evidence of confusion among FIU employees cited by Plaintiffs is the deposition testimony of Rafael Paz, FIU's Rule 30(b)(6) designee. In his deposition, Paz stated that he had "received information from employees indicating that they, themselves, have seen an application of the mark and were confused or that they were questioned by someone who was asking about FNU and was confused" [D.E. 19-4 at 47]. Paz did not identify these employees, and he could not say how many employees made these observations. *Id.* at 57. One alleged instance of confusion involved "someone in the community"

finds that this is insufficient to support a finding that there is a likelihood of confusion arising from FNU's marks.

After examining all of the *Frehling* factors and the relevant evidence and arguments, the Court finds that FIU has not established that Florida National University's mark creates a likelihood of confusion.  Though "Florida National University" and "Florida International University" sound similar, there is little else about the two marks or the two schools that is likely to cause confusion in the marketplace.  While there is some overlap in the degrees offered by FIU and FNU, most of FNU's students are pursuing degrees or courses that FIU doesn't offer, and the differences in academic standards for applicants suggest two vastly different pools of potential students, making the likelihood of confusion unlikely.  Moreover, the Court finds that, in light of the time and financial commitment college entails, a consumer in the market for a post-secondary degree should be considered a sophisticated or "well-informed" consumer less likely to be confused by a mark.  *See Freedom Savings*, 757 F.2d at 1185; *Welding Services,* 509 F.3d at 1361.  FIU's evidence of intentional infringement is not persuasive, and the evidence of actual confusion is *de minimis* at best.  Finally, the crowded field of schools using the terms "Florida" and "University" both weakens FIU's marks and diminishes the likelihood that consumers would be appreciably confused by FNU's marks.  Because FIU has failed to establish that FNU's mark creates a likelihood of confusion, FIU trademark infringement claim under 15 U.S.C. § 1114(1)(a) must fail.  Therefore, FIU's motion for summary judgment on Count I of the Complaint is DENIED, and FNU's motion for summary judgment on Count I of the Complaint is GRANTED.

---

who approached an FIU employee, who then reported the exchange to Paz. *Id.* at 57-58.  The Court does not credit Paz's hearsay statements.

IV.     **Count II: Federal Unfair Competition**

In Count II of the Complaint, FIU alleges that FNU's use of its mark falsely represents to the public that FNU is affiliated with FIU, in violation of 15 U.S.C. § 1125(a) [D.E. 1 ¶¶ 42-47].  FIU seeks summary judgment in its favor on this claim [D.E. 19-1 at 15-16].  FNU argues that in this claim FIU essentially seeks to assert a claim on behalf of the entire state university system, and therefore the motion should fail for lack of standing and for exceeding the scope of the pleadings [D.E. 27 at 11-18].

Section 43(a) of the Lanham Act provides that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, *or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person*, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).  Plaintiff asserts that it has established a "false endorsement" claim under 15 U.S.C. § 1125(a)(1)(A) [D.E. 31 at 9].  To prove a federal unfair competition claim under 15 U.S.C. § 1125(a)(1)(A), a plaintiff must show (1) that it had prior rights to the mark at issue and (2) that the defendant adopted a mark or name that was the same, or confusingly similar, to plaintiff's mark such that consumers would likely confuse the two.  *See Suntree Technologies*, 693 F.3d at 1346

(internal citations omitted).  The legal standard for unfair competition under both the Lanham Act and the common law has been held to be essentially the same as the standard for trademark infringement.  *Turner Greenberg Assocs., Inc. v. C & C Imp., Inc.*, 320 F.Supp.2d 1317, 1330 (S.D. Fla. 2004) (citing *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n.3 (11th Cir. 1991)).  Courts therefore apply the same seven-factor "likelihood of confusion" test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims.  *See Custom Manufacturing*, 508 F.3d at 647-48.  Thus, to the extent that FIU's unfair competition claim mirrors its infringement claim, its motion for summary judgment must fail, because FIU has failed to establish a likelihood of confusion based on FNU's mark.

However, FIU has advanced an additional theory of unfair competition.  FIU alleges that FNU has violated the Lanham Act "by creating the false impression that it is a public university associated with the State University System of Florida, of which FIU is a member, and thus creating the appearance that FIU and FNU are 'sister institutions'" [D.E. 19-1 at 16].  As evidence of this, FIU relies on the following facts: (1) that FNU "purposefully omits identifying itself as 'for-profit' or 'private' in its promotional materials"; (2) that FNU has adopted the "naming convention" of FIU and other state universities; (3) that FNU has adopted the  course numbering system used by state universities, including FIU; and (4) that FNU falsely represented in course catalogs that it has a "transfer and articulation agreement" with FIU.  *Id.*  Though FIU has not articulated how these additional facts should be applied under the *Frehling* likelihood of confusion test, it appears FIU is offering this evidence as further proof of actual confusion, and proof of FNU's allegedly improper intent.

These additional arguments do not tip the scale in FIU's favor.  In support of its argument, FIU relies primarily on the survey conducted by FNU's expert, Gerald Ford, who found that anywhere from 30 to 50 percent of those surveyed believed that Florida National University was affiliated with the state of Florida or some other government entity [*see* D.E. 19-6 at 38-56].  In Plaintiff's view, this is evidence that "the public is confused as to whether FNU is operated by or affiliated with the State of Florida or another governmental entity, just like FIU" [D.E. 19-1 at 17].  However, the relevant inquiry is whether FNU's use of the mark is likely to lead consumers to confuse FNU *with FIU.  See Suntree Technologies*, 693 F.3d at 1346 ("In order to prevail on federal claim of trademark infringement and unfair competition [under 15 U.S.C. § 1125(a)(1)(A)], a trademark owner must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were *likely to confuse the two*") (internal quotations and citations omitted) (emphasis added).  In his survey, Ford specifically asked respondents if they believed FIU had a business affiliation with FNU, and only two of 200 respondents answered in the affirmative [D.E. 19-6 at 52].  So while a significant portion of the public may be confused about FNU's affiliation with the State of Florida, this confusion has not resulted in an appreciable increase in confusion over FNU's affiliation with FIU, which is the basis of this claim.  And with regard to the other facts highlighted in FIU's argument – FNU's adoption of the same course numbering system used by state universities, and its failure to note its for-profit status in promotional materials – the Court does not find these facts to be persuasive.  For these reasons, FIU's motion for summary judgment on Count II of the

Complaint is DENIED, and FNU's motion for summary judgment on Count II is GRANTED.

**V.      Count III: Florida Trademark Dilution and Injury to Business Reputation**

With this claim, FIU alleges that FNU has wrongly diluted the distinctiveness of the FIU marks by using a confusingly similar mark, in violation of Fla. Stat. § 495.151 [D.E. 1 ¶¶ 48-52]. Dilution under Florida law "differs from infringement in that it does not necessarily depend on either competing goods or likelihood of confusion." *Anderson v. Upper Keys Bus. Grp., Inc.*, 61 So.3d 1162, 1171 (Fla. Dist. Ct. App. 2011) (quoting *Great S. Bank v. First S. Bank*, 625 So.2d 463, 470 (Fla. Dist. Ct. App. 1993)). Courts have found that the standard for establishing a dilution claim under Florida law is essentially the same as that of a dilution claim under the Lanham Act.[11] *See, e.g., Wyndham Vacation Ownership, Inc. v. Timeshares Direct, Inc.*, No. 6:13-cv-195-Orl-28DAB, 2013 WL 5289734, at *4 (M.D. Fla. Sept. 19, 2013); *Rain Bird Corp. v. Taylor*, 665 F.Supp.2d 1258, 1267 (N.D. Fla. 2009). To prevail on a dilution claim, the plaintiff must show that: (1) the plaintiff's mark is famous; (2) the defendant used the plaintiff's mark after the plaintiff's mark became famous; (3) the defendant's use was commercial and in commerce; and (4) the defendant's use of the mark has likely caused dilution. *Rain Bird*, 665 F.Supp.2d at 1266-67. In defense against this claim, FNU argues that FIU has failed to establish that its mark is "famous," and that FIU has failed to establish that FNU's mark is likely to cause dilution of FIU's mark [D.E. 25 at 20-21; D.E. 27 at 18-20].

---

[11] Effective January 1, 2007, the Florida Legislature amended Fla. Stat. § 495.151 to track 28 U.S.C. § 1125(c), the Federal Trademark Dilution Act. *See Samson Distrib., Inc. v. Kreger*, No. 8:07-cv-290-T-24-MSS, 2007 WL 2254498, at *2 (M.D. Fla. Aug. 3, 2007).

### A. Determining whether FIU's marks are "famous"

"To be 'famous' in the context of a trademark dilution claim, the mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be truly prominent and renowned." *MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc.*, No. 11-24110-CIV, 2013 WL 3288039, at *16 (S.D. Fla. June 28, 2013) (internal quotations and citations omitted); *see also Brain Pharma, LLC v. Scalini*, 858 F.Supp.2d 1349, 1357 (S.D. Fla. 2012) ("Trademark dilution claims are limited to truly famous marks such as Budweiser beer, Camel cigarettes and Barbie dolls") (internal quotations and citations omitted). In determining whether a mark is "distinctive and famous" for purposes of the Florida statute, a court may consider the following factors:

(a)  The degree of inherent or acquired distinctiveness of the mark in this state;
(b)  The duration and extent of use of the mark in connection with the goods and services with which the mark is used;
(c)  The duration and extent of advertising and publicity of the mark in this state;
(d)  The geographical extent of the trading area in which the mark is used;
(e)  The channels of trade for the goods or services with which the mark is used;
(f)  The degree of recognition of the mark in the trading areas and channels of trade in this state used by the mark's owner and the person against whom the injunction is sought;
(g)  The nature and extent of use of the same or similar mark by third parties; and
(h)  Whether the mark is the subject of a Florida or federal registration.

Fla. Stat. § 495.151(1)(a)-(h).  FIU argues that its marks have become famous by virtue of the university's widespread use of the marks for 50 years, and its regular advertising and promotion using the marks [D.E. 19-1 at 19].  Based on Plaintiff's longstanding and widespread use of the marks "Florida International University" and "FIU," combined with the federal registration of these marks, the Court finds that Plaintiff has established that its marks have achieved the requisite level of fame within the meaning of the statute.

28

## B. The Likelihood of Dilution

FIU argues that FNU is committing "dilution by blurring" – that is, that FNU is "impermissibly creating an association" arising from the similarity between its mark and FIU's marks, thus diluting the distinctiveness of FIU's marks [D.E. 32 at 19].  In determining whether a mark is likely to cause dilution by blurring, the Court may consider all relevant factors, including the following: (i) the degree of similarity between the mark and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark intended to create an association with the famous mark; and (vi) any actual association between the mark and the famous mark. *Rain Bird*, 665 F.Supp.2d at 1267 (citing 15 U.S.C. § 1125(c)(2)(B)).

In support of its motion on this claim, FIU raises arguments similar to those raised in its infringement claim.  FIU argues that FNU's marks are "strikingly similar in appearance, sound and meaning," that FIU has exclusively used its marks, and that FNU has "demonstrated an intent to create an association with [FIU] and the State University System, of which FIU is a member" [D.E. 19-1 at 20].  However, the Court has already rejected the most potent of these arguments in the context of FIU's infringement claim.  While "Florida International University" and "Florida National University" may indeed sound the same, the words "international" and "national" have different meanings, and though only two syllables distinguishes the two marks, those two syllables are not insignificant.  And given the brevity of the initialisms "FIU" and "FNU," the one-letter distinction between the two *is* substantial, making a difference in

29

both the sound and the appearance of these two marks. Therefore, the Court finds that the degree of similarity between the marks does not favor a finding of a likelihood of dilution.

As evidence of intent to create an association, FIU argues that FNU included in its course catalogue a reference to a "transfer and articulation agreement" with FIU [D.E. 19-1 at 20]. As discussed above, FIU is one of 19 colleges and universities listed in FNU's course catalogue as schools with a "transfer and articulation agreement" with FNU, allowing transfer of credits among the schools [see D.E. 27 at 8]. According to FNU, FIU was inadvertently referenced in the catalogue after the transfer and articulation agreement expired in 2010.[12]  *Id.* at 7. For the reasons previously discussed, the Court does not find this single reference in FNU's course catalogue to be compelling or persuasive evidence of an intent to piggyback on FIU's name or goodwill. The results of the Ford study also suggest that there is not a serious danger that the public is likely to perceive Florida National University and Florida International University as representing a single source or origin of the services offered. For these reasons, FIU's motion for summary judgment on Count III of the Complaint is DENIED and FNU's motion for summary judgment on this count is GRANTED.

## VI.    Counts IV, V and VI: Florida Trademark Infringement, Common Law Infringement and Unfair Competition, and Cancellation of Florida Trademark Registration

FIU has also asserted a trademark infringement claim under Fla. Stat. § 495.131 and a common law claim for infringement and unfair competition [D.E. 1 ¶¶ 53-65]. The

---

[12] FIU has not stipulated to the existence of a previous articulation agreement with FNU [see D.E. 42 at 14, 18]. The Court finds it highly unlikely that FNU would invent a fictitious agreement with FIU, in an effort to create the illusion of an affiliation with FIU and deceive consumers, only to bury it in a single reference in the school's course catalogue.

parties agree that the test for Florida and common law trademark infringement and unfair competition is the same as that for federal trademark infringement and unfair competition [D.E. 19-1 at 18; D.E. 25 at 20].  *See also Investacorp. Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1521 (11th Cir. 1991).  Because FIU has failed to establish a likelihood of confusion as to its Lanham Act claims, its claims under Florida law also must fail.  *See Custom Manufacturing*, 508 F.3d at 652-53.

Finally, FIU has asserted a claim to cancel FNU's State of Florida trademark including the term "Florida National University" pursuant to Fla. Stat. § 495.101(3)(f), based on the alleged likelihood of confusion with FIU's marks [D.E. 1 ¶¶ 66-70]. Because FIU has failed to establish a likelihood of confusion, this claim also fails. Accordingly, FNU's motion for summary judgment as to Counts IV, V and VI is GRANTED.

## VII.    Conclusion

For the reasons stated above, Plaintiff Florida International University's Motion for Summary Judgment [D.E. 19] is DENIED, Defendant Florida National University, Inc.'s Motion for Summary Judgment [D.E. 25] is GRANTED.  Defendant shall file a proposed Order of Final Judgment within 10 days of the date of this Order.

DONE AND ORDERED in Chambers in Miami, Florida, this __3rd__ day of March, 2015.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE